The next case is CardioNet v. InfoBionic, 2020-10-18. Ms. Fukuda. Yes, good morning, Your Honors. May it please the Court. The District Court decision here, finding ineligible two CardioNet patents that improve cardiac monitoring systems, errs in two fundamental ways. The first way relates to Alice Step 1. It was error for the District Court to disregard the specification in finding that the claims are directed to an abstract idea when the specification specifically identifies how the claimed invention improves CardioNet monitoring systems and provides advantages over the prior art. And this includes advantages such as accuracy, clinical value, and so on, and efficiency, and so on. But counsel, we're not dealing with Section 103. We're dealing with 101. When you look at the 850 patent claims, as we must, claims recite a system reporting data, receiving data, processing data, and 996 similarly deals with passing data back and forth. These are abstractions, are they not? No, Your Honor. We have to look at every claim element as well as the Alice requires that we look to the specification to identify improvement over the prior art. The specification does do so, and when you look at the claims themselves, they actually go to the exact invention here. This is taking machine-identified atrial fibrillation or arrhythmia events, having human assessment of a subset of those events, finding the correlation or the necessary correlation between those two sets of data, and then generating a very, very specific display that allows tremendous increase to diagnosis and finding of therapeutic approaches for doctors in treating patients specifically for atrial fibrillation, but certainly also applies to other arrhythmia. So here what we're talking about is an entire system that involves pulling data from a together with what's happening at the central monitoring station where there's a trained technician reviewing that data and then pulling all that information together specifically to present it in a very specific manner so that the doctor can find it useful and be able to properly treat their patients. The specification claims that this is an advantage over the prior art. There is no evidence on the record that this exact methodology is a long-standing practice by doctors, other than just one analogy that's put forward by Infobionics, which is insufficient. There's nothing there that shows that this is a long-standing practice, much less so the type of overwhelming evidence that the recent Federal Circuit decision in CardioNet requires in order for something to be recognized as a long-standing fundamental practice. But a long-standing practice has been cited as relevant to our consideration of abstractness, but an idea is still an idea, isn't it? If information, passing information back and forth, is abstract, then is it conclusive that the practice may not have been undertaken previously as an old and to the level of just passing information back and forth, then that particular idea would be problematic. But that's not the claims here are directed to. And in particular, you have to account for every single element in these claims and note the specificity with which this claim is limited in terms of how that data is assessed, put together, and presented to the physician. So we are not by any means trying to preempt an entire way of passing data back and forth. We're not even saying we're trying to do that in a cardiac monitoring field. This is a very specific set of claims directed to an invention that has already been proven to be, you know, it has gathered industry praise. One of the inventors is one of the foremost electrophysiologists in the country with over 30 years of experience talking about the fact that he has never seen a presentation. Ms. Fukuda, this is Judge Chen. Just so I understand the playing field, it was already well known and established to have a monitoring system configured to detect physiological data and then identify arrhythmia events from that physiological data. That's right? That particular aspect did exist, yes. Okay, so then what if the claim just said that a monitoring system that's going to detect physiological data and then identify arrhythmia events from that data and then in addition have a person review that report of arrhythmia events from the monitoring system to make his or her own independent assessment of whether the monitoring system's report of events was correct or incorrect in different places? Would that be a patent-eligible invention? That would be a much broader set of inventions than claimed in these claims. I understand that. I'm just trying to figure out my hypothetical. Okay. Putting on top of already well-established way of detecting arrhythmia events by inserting a human being to take a look at that report out and fine-tune that on the relative accuracy of the monitoring system's report out on arrhythmia events. Would that be a patent-eligible invention? I would say that that gets much closer to a not-eligible patent invention, because what I'm not seeing here is the software innovation that's required to be able to find correlation and so forth. So, where in your claim, pick a claim and then show me where in your claim you've got something that distinguishes that claim from my hypothetical such that I can feel like this is not just an abstract idea, but this is in fact some improvement, some technical improvement to a monitoring system. That's what I'm curious about. Yes, Your Honor. Let's take a look at the 996 patent at claim 23. Did you recite this in your blue brief somewhere? We discussed all the claims in terms of their commonalities. But if you turn to appendix 61, my apologies, appendix 62, you'll see that claim 23, which is one of the claims at issue here. So, in claim 23, this is a cardiac monitoring system that's being claimed. And Judge Chen, it does mention the aspect you had discussed regarding a monitoring system here. But note that, obviously, this one is limited to a specific type of event, atrial fibrillation event. And then you also have a monitoring station for receiving that data. So, if we get past that, we get to the next element, which is a processing system, which is configured to receive this information. And so, even if you assume, for now, that everything before this is abstract, you get to a very particular situation here, where you take this data, and then you receive a human assessment of a subset of this machine-identified event. And in the next element, you're pictographically presenting all of that assessed and combined data. And you're doing it in a very specific manner. So, you're going to depict this for multiple time intervals in a defined time period in alignment with indications of atrial fibrillation activity. And on top of all of that, you'll see there's a phrase that says, during the defined period, such that heart rate trend is presented with atrial fibrillation event burden, and a range of heart rates and a heart rate average are displayed for each of the multiple time intervals. Now, atrial fibrillation burden, or event burden, is defined in the specification as having to take into account the number of episodes of atrial fibrillation, as well as the duration. And the specification says that being able to present all of this data together has very important clinical value for therapeutic reasons. Doctors now, for the first time, can look at that data in alignment with each other to figure out when are these atrial fibrillation episodes happening during the day. Is there a pattern? Is something else happening? What's the heart rate at that time? What's the variation across the heart rate? And there is evidence in the record that this has led to significant improvement in terms of therapy, particularly for an electronic cardiac monitoring system, where you have so much data that's coming in over 24 hours over the duration of a week or two. You know, this invention specifically. But, counsel, brilliance and usefulness do not necessarily negate abstractness, do they? Not by itself, your honor. A lot of very fine ideas. And that doesn't mean that they're necessarily eligible for patent. Your honor, not by itself. There's certainly case law saying that the mere brilliance is not enough. But what we have here is a specific combination of a specific application in a technological field with specific limitations that also leads to brilliance and innovation in clinical and the specifications claim it. And the record evidence does not refute it. Under cardiomet, the recent cardiomet decision issued from this court, this results in exactly the same finding of non-abstractness. And we will get to step two, your honor. But I reserve that if possible, unless you have any questions on step two right now. So what is the relationship here? This is what this is doing is scrubbing out irrelevant data. Is that the point? No, your honor. Well, that's a part of it, right? Obviously, one of the problems specifically with electronic cardiac monitoring devices is that they could have this artifact noise that shouldn't be counted. So having human assessment of a subset of it and then finding a correlation is important to make sure that the data that's being presented isn't just clouded by noise. So that's one aspect of it, but certainly not all of it. Because then you have to take that data and actually present it in a way that's useful to the practitioners and the physicians for use and diagnosis and treatment. What does that mean? Wrapping it? Presenting it in a display in the specific manner claimed here so that they can look at the information in alignment with each other. Just because someone has atrial fibrillation does not give the doctor specific information about when of the day it's happening, what else is going on with the heart rate at that time, how is it changing from minute to minute, hour to hour. And not being able to do that over the course of a week or two is sort of the state of the art at the time. Counsel, let's hear from the Pelley. And we will save three minutes of rebuttal time for you. Mr. Grant? Thank you. May it please the court. I want to make one very important point. Counsel for CardioNet said it requires a very, very specific display. Below in plaintiff's opening claim construction brief, which is not in the appendix, but it's in the record at page 12, CardioNet said, quote, the claims impose no limitations on how the information must be pictographically presented and would include any form of pictographic presentation of the required data, end quote. In the appendix at 11495, which is the claim construction hearing transcript, CardioNet's counsel said, it doesn't even have to be a graphic. It can be in any form. And at column four, line six to seven, it says a graph is not required. So please let me disabuse... Mr. Grant, you might lower your voice a bit. We can hear you very well. I apologize. I apologize. The point is, it's absolutely incorrect to say that a specific display is required. Expressly, that was disclaimed. Now, with regards to the monitoring system, if you look... Mr. Grant, at least for claim 31 of the 850, which, for me, I'm looking at as one of the representative claims, it does say you're presenting the heart rate data and the arrhythmia event data using a common timescale. So is there at least... In this particular claim itself, it's expressly explaining to you how these two sets of data should be displayed. Well, it's all it's saying, Your Honor. And as I noted, they say there's no limitation on how to do it. But all they're saying is that you have to display it on a common timescale. That's exactly the situation in trading technologies and electric power. If you look at the red brief at pages 39 to 41, you can compare the graphs with electric power, trading tech, and the University of Florida, which were far more detailed, included a common timescale, and were all found to be abstract and not patent eligible. In fact, what we're doing here, Judge Chan, to use your analogy, is the data is coming in from the pacemaker or the prior art system. It's going to the interns, which are the system. It's then being spot checked by a nurse or some other cardiac technician. And then it's being displayed with, as I noted, no limitations on how that display is occurring other than in claim 31, a common timescale. That does nothing but, as in Smart Gene, do what doctors have done routinely for years. So the next issue that I would take on, Your Honor, is this idea that, and I think Judge Lori caught it, the idea that you need to have evidence that something is conventional in the record to find it abstract. That's not the case. There's two ways to find abstraction. One way is by a longstanding practice, which CardioNet says there's no evidence of. As we know, in Alice, there was no evidence that the information there was a part of a longstanding practice. If you look at the citation in Alice, it's to the concurrence from this court's opinion, which cites no record evidence because it was straightforward and known. If you look, for example, at the electric communication technologies case from a couple pickup and delivery or supplying customers with order numbers and customer information, those were known despite the fact that there was no evidence. In Capital One, we have exactly the same situation where the ordering of that information was found to be longstanding. Regardless, it's still abstract, even if it's human performable. FLUC stands for that, as does the trading technologies case regarding a new arrangement of data, the SAP case and a new statistical analysis, and again, the electric communications case, which assumed that the Claim 11 was a new way of doing it. That doesn't impact the analysis. The last point that I think is important for the court to consider is the procedural posture of this case, particularly as compared to the 207 appeal. In this case, albeit a motion on the pleadings, that motion on the pleadings went up after fact discovery was complete, not started, complete. After claim construction hearing not had started but was complete, fully argued, and if you look at the transcript of the hearing on this motion, you'll see the court asking questions about the interaction between the arguments presented by Cardionet at claim construction and here. Notably, despite the fact that this is a 12C and that Cardionet had the opportunity to put in affidavits, in fact, they put one in that's not really germane to any of the issues before the court, they had a full and complete evidentiary record had they been able to identify any factual issue, and then the court would arguably have had to convert it to summary judgment. The procedural posture here is entirely different from the 207, aside from the substantive differences that were pointed out by, I believe, Judge Dyck of what was being claimed to be improved in the 207, as opposed to the mere display of information in this case. The court doesn't have any additional questions with regard to these straightforward patents that are focused purely on gathering information using conventional pacemakers, taking that information and identifying arrhythmia events using conventional technology, having that being spot-checked by a human and then pictographically displayed with absolutely no limitation whatsoever on how it should be displayed, other than arguably the one limitation in Claim 31 that the court's ruling was substantively and procedurally proper. Having a human spot-check a machine's results and display data in a purportedly new arrangement is just as abstract as the claims in Trading Tech, Electric Power, and University of Florida, and no additional evidence is needed here anymore in those cases. Humans have long performed the activity recited in the claims, reviewing physiological data to identify events, seeking second opinions, and graphing, albeit with no limitation, the data. But even if these activities hadn't been performed under the court's controlling precedent, they remain abstract. The eligibility ruling came on 12C after discovery, after claim construction, and after CardioNet amended its complaint three times, the last time of which was after the 101 motion was already on file. And even after all of that, there are no material fact issues that CardioNet has identified, and certainly none that they identified to the district court. The trial court's judgment should be affirmed. Thank you. Mr. Grant, you may know Federal Circuit case law better than I do. What was that one case called, Electric Communications? Yes, Your Honor. Electric Communication Technologies. It came out on May 14th, and it's cited in the supplemental authority that is before the court, so it is part of the record. That was also a motion for judgment on the pleadings. It was a motion where this court found that those two issues I said, providing advanced notification, supplying customers, order numbers, and the like, that those were longstanding practices that were abstract without evidentiary support for that. And it then went on to say that the patentee argued that because an abstract idea was unique, that it was somehow different, and the court there assumed that the techniques were groundbreaking, innovative, but that that is not enough for eligibility. And in so doing, the court found the patented issue ineligible under 101, and the citation I have is 958F3rd, beginning at 1178. Okay. Thank you. Yes, sir. Anything? Any further questions from the panel? Thank you, Mr. Grant. Thank you, Your Honor. Ms. Fukuda has three minutes for rebuttal. Thank you, Your Honor. I've heard electric power come up a number of times. I would like to address that. Electric power does not apply to this case, because it's clear there that the court found that the claims covered every potential solution to analyzing and displaying the data. And in fact, the actual claim says displaying the event analysis results. That is not our situation here. I know Mr. Grant likes to summarize that as being just displaying, but it's clear in every claim that the display has to be a very specific manner, it has to meet every one of those elements, and that's not the situation in electric power. Even though electric power has figures that are very fancy and complicated, none of that was in the claims, as it is in the cardmonite claims here. I've also heard trading technologies being discussed regarding the display format. Your Honor, in our brief, we note that there was a different trading technology, the Federal Circuit decision against C2G in 2017, where the eligibility of a patent was affirmed, and that also involved displaying market information. But there, they did it in an inventive way. So it's not just the display that makes it abstract, it's how broadly you're claiming the display that matters. In the University of Florida case, the patent itself acknowledged that this data was previously collected, analyzed, manipulated, and displayed, and that it simply proposes doing so with a computer. None of those cases apply here, because as we had presented, Your Honor, we have a very Our case is more like Data Engine versus Google, where a method for navigating through spreadsheets was found eligible and was applauded by the industry. We're also like the Core Wireless Licensing versus LG Electronics case, where a particular manner of summarizing and presenting information in electronic devices was found to be eligible. The claims were found to recite to a specific improvement over prior art systems, and it So certainly there's precedent saying that it really depends on how specific your claims are, where their eligibility attaches. Your Honor, I know that Mr. Grant mentioned that there was a much fuller record, and even if step one is not satisfied, we here do satisfy step two of an inventive concept in multiple elements of the claims, as well as the order combination. There's plenty of record in our, plenty of arguments in our briefs. We'll rest on that in the interest of time, but there are multiple IPR decisions that verify that this combination and multiple elements were nowhere found in the prior art. And this is the best prior art that InfoBionic could put in front of the PTO after one to two years of searching. And with that, Your Honor, we'll just rest on our briefs. Thank you, Counsel. We have your arguments, and the case will be submitted, case is submitted. Thank you. Thank you. Thank you. The Honorable Court is adjourned until tomorrow morning at 10 a.m.